## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **M-L-Z-**, | Case No. 2:25-cv-5479 |
| *Plaintiff* | J. Baylson |
| v. | **MOTION FOR AND MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION** |
| **KRISTI NOEM**, in her official capacity as Secretary, U.S. Department of Homeland Security; **ANGELICA ALFONSO-ROYALS**, in her official capacity as Acting Director of U.S. Citizenship and Immigration Services; and **JOSEPH E. KERNAN**, in his official capacity as Director, U.S. Citizenship and Immigration Services Asylum Vetting Center, | ORAL ARGUMENT REQUESTED |
| *Defendants* | |

## MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff M-L-Z-, through undersigned counsel, respectfully submits this brief in support of his motion for preliminary injunction. For the reasons explained below, the Court should grant Plaintiff's motion and issue a preliminary injunction that requires Defendants to (1) Order USCIS to rescind the June 17, 2025, dismissal of Plaintiff's Form I-589 Application for Asylum and Withholding of Removal, (2) Order USCIS to restore Plaintiffs' I-589 affirmative asylum application in the U.S. Citizenship and Immigration Services ("USCIS") system, (3) Order DHS to refrain from arresting, detaining, or removing Plaintiff pending resolution of this case.

## I.    FACTUAL BACKGROUND

Plaintiff fled Nicaragua under threat of persecution as a political dissident, because of his participation in the 2018 peaceful protests and the government's subsequent brutal retaliation. *See* U.S. Dept. of State Human Rights Report for Nicaragua 2018.[1] President Ortega responded to those peaceful protests by ordering police and masked armed parapolice groups to shoot and kill protestors. *Id.* By November, the government had killed at least 325 people, injured over 2,000, illegally detained and tortured hundreds, and exiled more than 52,000 citizens. *Id.* Plaintiff himself became a direct target of the Nicaraguan government; from 2018 until he fled Nicaragua in 2021, he was threatened with arrest, kidnapping, detention, and death by the government and was placed under 24-hour surveillance by paramilitaries and police. Ex. 10 (Plaintiff Aff.). He twice fled his home and relocated within Nicaragua,

---

[1]    Available at: https://www.state.gov/wp-content/uploads/2019/03/NICARAGUA-2018.pdf

hoping things would improve so he could return home to his wife and children. *Id*. at ¶5-8, 12-15. But the situation only worsened, as the government passed laws to prohibit political opposition and sanctioned detention and torture of citizens with opposing viewpoints. *Id*. at ¶12-15. After Plaintiff's home was physically marked in paint as the home belonging to a government traitor, Plaintiff fled Nicaragua permanently, seeking protection in the United States. *Id*. at ¶14-17. His family followed nearly a year later out of persistent fear and continued threats. *Id*. at ¶21-23.

Plaintiff arrived in the United States on July 21, 2021, intending to seek asylum, and properly presented himself to immigration officials at the United States border at Eloy, Arizona. *Id*. at ¶18. He expressed a fear of return to Nicaragua and his desire to seek asylum and protection in the United States from political persecution. *Id*. Initially, CBP officers detained him. *Id*. The United States Government could have placed Plaintiff into expedited removal proceedings at that time, but did not, declining to serve him a Form I-860, Notice and Order of Expedited Removal or inform him in any way that he was being placed into expedited removal proceedings. *Id*. Instead, on August 4, 2021, DHS told him that he would receive a notice of a hearing to appear before an immigration judge and issued him a Notice of Custody Determination, releasing him on his own recognizance via ICE Form I-220A pursuant to 8 U.S.C. § 1226. Exs. 2 (Form I-220A); 10, ¶18. Plaintiff traveled to Philadelphia and complied with all conditions of his release, including reporting to

the Philadelphia ICE Field Office as requested. Exs. 3 (Release on Recognizance Log Sheet), 10, ¶19.

In Philadelphia, Plaintiff obtained *pro bono* counsel from the Nationalities Service Center to assist him with his asylum application. Ex. 10, ¶20. This was complicated by the government's inaction—ICE never placed him into immigration removal proceedings under 8 U.S.C. § 1229a, where he could have submitted his asylum application. *Id.* Plaintiff's counsel repeatedly asked ICE to issue him a Notice to Appear ("NTA"), the charging document necessary to begin his removal proceedings, within the one-year deadline for filing for asylum. Ex. 4 (Counsel's Email to ICE/ERO, Mar. 16, 2022); 8 U.S.C. §1158(a)(2)(B). When ICE refused to do so, Plaintiff through counsel affirmatively and timely filed a Form I-589, Application for Asylum and Withholding of Removal, with USCIS on April 21, 2022, within one year of his arrival to the United States. Ex. 5 (I-589 Receipt Notice). The Government sent him a Receipt Notice on August 4, 2022, stating that his application was complete and pending with the Asylum Office. *Id.* Other than asking him to provide biometric information—which Plaintiff did on August 25, 2022—the Government subsequently took no action on that application for several years. Ex. 6 (Biometrics Notice with Compliance Stamp).

Even without action on the asylum application, Plaintiff derived meaningful protections from the mere fact that the application was pending. Among them, he could not be deported while the Government considered his asylum request; he also sought—and received—work authorization from the Government, authorization that

by law is not available to people who have no status and no pending applications for relief. Ex. 7 (Expired Employment Authorization Card). He timely renewed his work authorization application in 2024, before its expiry, again relying on his pending asylum application. Ex. 9 (Renewed Employment Authorization Card). He similarly sought and received a social security number. Ex. 8 (Social Security Card). Plaintiff used that authorization and the social security number to obtain good-paying work, pay taxes, and build a life away from the brutal repression he faced in Nicaragua. Ex. 10 at ¶24-25, 28.

Recently, however, the Government illegally dismissed his Asylum Application with USCIS. It informed Plaintiff of the dismissal in a letter dated June 17, 2025, but postmarked August 8, 2025. Ex. 1 (USCIS Notice of I-589 Dismissal). That dismissal violates the United States Code and Code of Federal Regulations, the Administrative Procedures Act, and Plaintiff's due process rights. In purporting to dismiss his asylum application, the Government asserts that an expedited removal order was issued pursuant to 8 U.S.C. § 1225. *Id.* However, there is no evidence such an order exists— the letter Plaintiff received lists his A-number and current address but provides no other information about the purported order. *Id.* But, if such an order does exist, it only underscores the unlawfulness; the Government never followed the process required by law to issue an expedited removal order, including providing notice of the charges and an opportunity to respond, proper service of the order, and a chance to express a fear of deportation to Nicaragua. So, while there is no evidence a notice of expedited removal exists at all, if it does, it assuredly does not comply with federal

statute and regulations, *see, e.g.*, 8 C.F.R. § 235.3(b)(2)(i) (requiring, among other things, reading the record to the Plaintiff, certifying Plaintiff's acknowledgment of receipt, and allowing Plaintiff an opportunity to respond).

Plaintiff is not alone. Attorneys have recently noticed that the Government apparently seeks to place more noncitizens in expedited removal proceedings—where they have fewer legal protections—and are doing so in part by targeting people in Plaintiff's position. The Government has been dismissing affirmatively filed asylum applications by people who arrived at the southern border between 2021 and 2023, claiming that they are in expedited removal proceedings without required notice or process. Exs. 11 (Cambria Aff.), ¶4-10, 14; *e.g. Make the Rd. N.Y. v. Noem*, No. 25-cv-190, 2025 WL 2494908 (D.D.C. Aug. 29, 2025) (recognizing the government's "aggressive use of its newly expanded expedited removal power" to "promptly arrest[] individuals inside of those courts, and then shuttled them into much faster moving—and much less procedurally robust—expedited removal proceedings," and staying the government's expansion of expedited removal as violating due process); *Coal. for Humane Immigrant Rights v. Noem*, No. 25-cv-872, __ F.Supp.3d __, 2025 WL 2192986, at *5, *36 n.14 (D.D.C. Aug. 1, 2025) (recognizing that "hundreds of thousands of noncitizens" "now face the threat of removal under highly truncated procedures," and that "DHS sees and is using expedited removal as a basis to arrest and detain immigrants"). The Government has also arrested and detained those people at their next contact with ICE or other law enforcement, based on the absence of status caused by the asylum application dismissals. Exs. 11, ¶6-10; 14, *3.

Plaintiff's asylum application dismissal immediately imposed ongoing harms on him. First, it risks locking him out of asylum in the United States. Potential asylees must seek that status within one year of arriving; dismissing his application means that he has not done so. 8 U.S.C. § 1158(a)(2)(B). Second, it imposes the immediate risk of detention. People without status may be detained at any time, and because of other actions of the Government, Plaintiff faces an imminent risk of detention. *See* 8 U.S.C. §§ 1225, 1226. Third, it has harmed his quality of life in the short term. His fear of arrest and detention has changed his daily activities and is causing him ongoing emotional distress for which he is seeking professional assistance. He has skipped work, avoided activities, and generally limited his time out of his home. Ex. 10, ¶24-32. Other than work and taking his children to school, Plaintiff does not go out—he is afraid even to go to the supermarket. *Id*. He is avoiding "anything that is more than meeting our basic needs." *Id*. at ¶31. And he is now suffering from severe anxiety, seeking professional assistance on that basis for the first time in his life. *Id*. at ¶32.

At bottom, the United States is currently unlawfully stating that Plaintiff is, right now, subject to arrest, mandatory detention and expedited removal at any moment, in an attempt to retroactively change the decision it made more than four years ago.

## II.    LEGAL FRAMEWORK

There are two aspects to the legal framework here. The first is relevant immigration law, and the second is relevant administrative law that also applies to DHS and its components.

### A. Relevant immigration law

Prospective asylees must apply for asylum within one calendar year of arriving in the United States. 8 U.S.C. § 1158(a)(2)(B). Regulations require USCIS to adjudicate all complete asylum applications that are within the agency's jurisdiction: "USCIS shall adjudicate the claim of each asylum applicant whose application is complete within the meaning of [8 C.F.R.] § 208.3(a)(2) or (c)(3), when applicable, and is within the jurisdiction of USCIS pursuant to [8 C.F.R.] § 208.2(a)." 8 C.F.R. § 208.9(a). That adjudication matters in part because prospective asylees have limited avenues in which to seek it. Applicants must either apply for asylum affirmatively with USCIS or defensively in immigration court. 8 C.F.R. § 208.2(a)-(b). And applicants have no control over the commencement, process, or timing of removal proceedings in immigration court against them—only the Government can institute those proceedings. 8 U.S.C. § 1229. When the Government does wish to institute removal proceedings in immigration court, it must file a charging document, typically an NTA, with the Executive Office for Immigration Review ("EOIR"), which charges a noncitizen with removability, and vests the immigration court with jurisdiction. 8 U.S.C. §§ 1229, 1229a; 8 C.F.R. § 1003.14(a). Asylum applicants cannot be deported while their application is pending.

Expedited removal offers asylum applicants far fewer rights and less process compared to normal removal proceedings in immigration court. *See* 8 U.S.C. § 1225(b); 8 CFR § 235.3. Expedited removal allows the government to quickly deport people under certain circumstances, including noncitizens who have not been admitted or paroled and cannot show they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(iii). The government must follow procedures required by statute to remove someone via expedited removal. 8 U.S.C. § 1225(b)(1)(A)(i) requires that the Government issue a person it wishes to remove on an expedited basis a Form I-860 (Notice and Order of Expedited Removal). *See also* 8 C.F.R. § 235.3(b)(2). Prior to issuing such a form, the Government must provide notice, create a record, undertake a credible fear screening, and serve the recipient. *Id*. The Government failing to serve Form I-860 renders the expedited removal order void, and nullifies any supposed basis for removal.

The expedited removal process presents an additional hurdle before an applicant can present their asylum application. Asylum seekers placed into expedited removal must first indicate they are afraid to return to their home country, and are then subject to a "credible fear interview" ("CFI"). 8 U.S.C. § 1225(b)(1)(A)(ii), (B); 8 C.F.R. § 208.30. If a noncitizen establishes a credible fear, the noncitizen will be transferred either to normal removal proceedings or to USCIS administrative asylum proceedings—Congress intended expedited removal to be a quick process, not indefinite. 8 C.F.R. § 208.30(f). This screening process, however, offers far inferior

procedural protections, in numerous ways. For one thing, the CFI process presents significant challenges to meaningful access to counsel. 8 U.S.C. § 1225(b)(1)(B)(IV); 8 C.F.R. § 208.30(d)(4). Even the most diligent lawyers who check in repeatedly, and whose clients "insist that [their attorney] be present" during a CFI, often "are never called" and barred from the interview—often with sloppy paperwork to justify that failure. Ex. 11, ¶18. In the rare circumstance where previously-retained counsel manages to be present, that counsel does not have a "real ability to advocate for a client because of strict rules on when an attorney can speak or present evidence." *Id.* at ¶4; *see also* 8 C.F.R. § 208.30(d)(4) (permitting an attorney to speak only "in the discretion of the asylum officer").

For another, the legal standard is different: in a CFI, a noncitizen must show a "credible fear of persecution," defined as a "significant possibility" that they would establish eligibility for asylum before an asylum officer or immigration judge in a future proceeding on the merits, as opposed to people who may simply present their asylum claim on the merits in the first instance without any intermediary screening. 8 U.S.C. § 1225(b)(1)(B)(v). Recent rule changes have heightened the screening standard for credible fear interviews and authorized officers to consider adverse factors that could previously be considered only in full removal hearings. *See* "Application of Certain Mandatory Bars in Fear Screenings," 89 Fed. Reg. 103370 (Dec. 18, 2024); "Securing the Border," 89 Fed. Reg. 81156, 81284-285 (Oct. 7, 2024); "Circumvention of Lawful Pathways" 88 Fed. Reg. 31314, 31450-452 (May 16, 2023).

The "mandatory bars" at issue can include complicated legal questions where the absence of counsel is all more prejudicial.

In addition, in the event that the interviewer—not an immigration judge—decides there is no credible fear, the noncitizen has no opportunity to seek judicial review in any forum. *DHS. v. Thuraissigiam*, 591 U.S. 103, 107 (2020). Instead, noncitizens are afforded only administrative review in a limited proceeding before an immigration judge. 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1003.42; Ex. 11, ¶21-28. Noncitizens who fail this review are "swiftly deported" during the expedited removal process with no opportunity to apply for asylum. Ex. 11, ¶4. In contrast, asylum decisions, either by USCIS or by immigration judges during removal proceedings, may be appealed to the Board of Immigration Appeals ("BIA") and then to the relevant U.S. Court of Appeals. 8 U.S.C. § 1252; 8 C.F.R. § 1003.1(b).

**B. Relevant administrative law**

Agencies must comply with due process and their own regulations, including in immigration matters. *Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures . . . even where the internal procedures are possibly more rigorous than otherwise would be required"). When agencies fail to adhere to their own policies, as required by *Accardi*, courts typically frame the violation as a due process violation, *see Sameena, Inc. v. United States Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) ("An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate

notice and consequently may result in a violation of an individual's constitutional right to due process.") (internal quotations omitted), or as arbitrary, capricious, and contrary to law under the APA, *see Damus v. Nielson*, 313 F. Supp. 3d 317, 337 (D.D.C. 2018) ("It is clear, moreover, that [*Accardi*] claims may arise under the APA"). As relevant here, USCIS and the Government have not only statutory and regulatory obligations under 8 U.S.C. § 1158(a)(1) and 8 C.F.R. § 208.9(a) to adjudicate asylum applications, but self-imposed obligations to do so. *See* USCIS Affirmative Asylum Procedures Manual ("AAPM")).[2]

The Government also has an obligation under the APA not to act in a way that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agencies are required to provide "reasoned explanation[s]" for their actions and cannot act on incomplete or procedurally defective records. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 35 (2020). While the ultimate decision whether to grant asylum on the merits of an application is discretionary, the agency has no discretion to refuse jurisdiction and dismiss properly filed applications based on unsubstantiated records.  *See* 8 U.S.C. § 1158(a)(1), (b)(1); 8 C.F.R. § 208.9(a).

## III.    ARGUMENT

To obtain preliminary injunctive relief, a plaintiff must show (1) a substantial likelihood of success on the merits and (2) that he is likely to suffer irreparable injury if relief is not granted. *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 319–20 (3d Cir. 2020). The court then considers (3) whether an injunction would harm the

---

[2] Available at: https://www.uscis.gov/sites/default/files/document/guides/AAPM.pdf

defendants more than denying relief would harm the plaintiff and (4) the public interest. *Id*. The first two factors are "the most critical." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2008)). When a Plaintiff demonstrates the first two, the court should then consider all four factors together and determine whether they "balance in favor of granting the requested preliminary relief." *Reilly*, 858 F.3d at 179. Injunctive relief matters particularly "when harm threatens to moot a case," and in such situations courts should look to "preserve the status quo during the pendency of litigation." *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200-01 (3d Cir. 2024) (internal citations omitted).

Here, Plaintiff is likely to succeed on the merits because Defendants have acted unlawfully. He is likely to suffer irreparably injury absent relief, because of several imminent harms—including the likelihood of detention and deportation if he comes into any contact with legal authorities. And the injunction would not harm the Government, which has no interest in acting contrary to law; by the same token, injunctive relief requiring the Government to follow the law would serve the public interest. A preliminary injunction should issue.

## A. Plaintiff is substantially likely to succeed on the merits of his claims.

Plaintiff is likely to succeed on the merits of his claims because USCIS's dismissal of his asylum application violates the Immigration and Nationality Act ("INA"), the Administrative Procedures Act ("APA"), and his right to due process. The straightforwardness of the Government's legal violations renders Plaintiff's

likelihood of success far better than required, which is only "significantly better than negligible but not necessarily more likely than not." *Reilly*, 858 F.3d at 179.

### i.    Defendants violated 8 U.S.C. § 1158(a)(1).

United States law gives Plaintiff the clear right to apply for asylum and have that application considered. Under 8 U.S.C. § 1158(a)(1), "any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival) […] may apply for asylum," unless subject to specific statutory bars enumerated in § 1158(a)(2). Plaintiff is not subject to any such bars. He entered the United States through the southern border, was briefly detained, and then released on his own recognizance. Exs. 2; 10, ¶17. He timely filed his asylum application within the one-year statutory deadline, and there is no evidence that he was ever issued a NTA or validly served with an expedited removal order. Ex. 5. District courts have treated similar circumstances—unlawful dismissal of a pending asylum application based on a purported expedited removal order and placement into expedited removal—as a clear violation and basis to provide injunctive relief. *E.g. E-C-R- v. Noem*, No. 3:25-cv-1230-SI, 2025 WL 2300543 (D. Or. July 16, 2025) (granting a TRO for an individual similarly situated to Plaintiff whose asylum application was dismissed by USCIS and notified she was subject to expedited removal); *Aviles-Mena v. Kaiser*, No. 25-cv-06783-RFL, 2025 WL 2578215 (N.D. Cal. Sep. 5, 2025) (same).

USCIS then unlawfully and prematurely dismissed Plaintiff's affirmative asylum application. It did so by baselessly asserting that he was issued Form I-860, Notice and Order of Expedited Removal, thus allegedly depriving USCIS of

jurisdiction over his asylum application. Ex. 1. In reality, Plaintiff was neither issued, nor served, with such an order. It was not until USCIS dismissed his asylum application, which had been pending for over three years, that the Government asserted, for the first time, that such an order even existed. The Government has not produced any Form I-860, and even if this purported Form I-860 exists, the government has not followed the procedure required by law before a Form I-860 can be issued, including notice, creating a record, credible fear screenings, and service. *See* 8 U.S.C. § 1225(b)(1); C.F.R. § 235.3(b)(1)(ii), (2)(i). Taken together, it has not complied with statutory and regulatory requirements governing expedited removal. *Id.*

Furthermore, expedited removal proceedings have never been initiated against Plaintiff. Plaintiff was not placed into expedited removal proceedings when he presented himself to immigration officials at the border and requested asylum. Ex. 10, ¶18. Immigration officials explicitly told Plaintiff that he would be able to see an immigration judge in normal removal proceedings and gave him documents stating as such. Exs. 2; 10, ¶18. Plaintiff was also not found inadmissible within two years, as required by statute. 8 U.S.C. § 1225(b)(1)(A)(iii). In fact, Plaintiff has never been found inadmissible and can show that he has been physically present in the United States continuously for over two years, precluding him from expedited removal. *Id.*

In short, USCIS has violated the INA by dismissing Plaintiff's asylum application in reliance on the purported issuance of a document that—if it exists at all—has never been served, has never been signed, and is invalid. Accordingly, USCIS

has violated its nondiscretionary duty to adjudicate Plaintiff's asylum application. 8 U.S.C. § 1158(a)(1); 8 C.F.R. § 208.9(a).

**ii.    Defendants violated the Administrative Procedures Act, 5 U.S.C. § 706(1) and 5 U.S.C. § 706(2)(A)-(C).**

USCIS acted arbitrarily, capriciously, and not in accordance with law when it refused to adjudicate Plaintiff's application as required by law. Plaintiff has the clear right to apply for asylum and have that application considered. 8 U.S.C. § 1158(a)(1). USCIS has a nondiscretionary duty to adjudicate asylum applications over which it has jurisdiction, including Plaintiff's asylum application. 8 C.F.R. §§ 208.2(a)(1); 208.9(a); Ex. 5. USCIS acted arbitrarily, capriciously, and not in accordance with the law when it violated this nondiscretionary duty by refusing to adjudicate Plaintiff's properly filed asylum application. USCIS also acted arbitrarily, capriciously, and not in accordance with law when it dismissed Plaintiff's application based on an unsubstantiated assertion that a Form I-860 was issued but regardless was not properly issued nor served if it does actually exist. *See* 8 U.S.C. § 1225(b)(1); C.F.R. § 235.3(b)(1)(ii), (2)(i).

Dismissal of Plaintiff's asylum application for lack of jurisdiction was arbitrary, capricious, and not in accordance with the law because USCIS clearly has jurisdiction to adjudicate it on the merits. USCIS's own regulations state it has a nondiscretionary duty to adjudicate all complete asylum applications that are within the agency's jurisdiction. 8 C.F.R. § 208.9(a). USCIS notified Plaintiff that his asylum application was complete and pending by exercising sole jurisdiction over the application for over three years. Ex. 5. And it granted him work authorization and

other privileges, which it only did in reliance on his pending application for asylum. Lest there be any doubt, USCIS has jurisdiction over Plaintiff's asylum application because removal proceedings have never been initiated against him, 8 C.F.R. § 208.2(a)(1), despite his repeated requests.

Dismissal of his application was also arbitrary, capricious, and not in accordance with the law because Plaintiff was never placed into expedited removal or issued an expedited removal order. As he has explained, Plaintiff was not found inadmissible within two years of his entry to the United States. 8 U.S.C. § 1225(b)(1)(A)(iii). Even if an imaginary Form I-860 does exist, Plaintiff was not given any opportunity to show that he was continuously present for two years before the Form I-860 was supposedly issued. *Id*. And even if an imaginary Form I-860 does exist, DHS did not comply with the numerous requirements that would render it valid—it did not create a record, did not read the record to Plaintiff, did not question the Plaintiff or record his answers, did not read to the Plaintiff these answers and have him sign and initial each page, did not advise Plaintiff to the charges against him nor allow him to respond, did not get supervisory review of the Form I-860, and never served Plaintiff with the form nor had him sign the back of it acknowledging receipt. 8 C.F.R. § 235.3(b)(1)(ii), (2)(i).

USCIS's dismissal of Plaintiff's affirmative asylum application also violates the agency's own procedures set forth in the AAPM. The AAPM expressly provides that dismissal for lack of USCIS jurisdiction based on an outstanding expedited removal order is appropriate only where a Form I-860, Notice and Order of Expedited

Removal, has been properly issued in compliance with 8 C.F.R. § 235.3(b)(2)(i). AAPM at pgs 199-203.[3] The AAPM further directs asylum offices to verify DHS and EOIR records to determine whether an NTA has been filed and docketed with EOIR, or whether a credible fear screening has been conducted, before administratively closing a case. *Id.*

Here, there is no evidence a Form I-860 even exists, or that the process required before it can be issued was followed. There is not even evidence that Plaintiff was ever subjected to expedited removal—in fact, all evidence suggests that he was not. Exs. 2; 10, ¶18. Instead, USCIS merely asserts that the I-860 exists, applies to Plaintiff, and that he will, at an unknown date, be referred to the credible fear screening process—a process that will surely result in his detention. Exs. 11, ¶6-10; 12 (Wisotsky Aff.),[4] ¶9-14; 14, *3; *E-C-R-*, *supra*; *Make the Rd. N.Y.*, *supra*; *Coal. for Humane Immigrant Rights*, *supra*; Martha Bellisle, *Homeland security officials defend immigration court arrests after being sued*, AP News (July 17, 2025) (reporting DHS official as stating it conserves law enforcement resources to arrest people at appointments "because they already know where a target will be")[5]; Ximena Bustillo, *Asylum-seekers thought they were following the rules. Now some are told to start over*, NPR (August 10, 2025) (reporting on USCIS asylum application dismissals, and the

---

[3] Available at: https://www.uscis.gov/sites/default/files/document/guides/AAPM.pdf
[4] Data from Wisotsky derives from settlement negotiations pertaining to Freedom of Information Act ("FOIA") litigation initiated by Legal Services of New Jersey against ICE, *Legal Services of N.J. v. Immigr. & Customs Enft.*, No. 23-CV-22222 (D.N.J.).
[5] Available at: https://apnews.com/article/ice-immigration-court-immigrants-a5190ada4a6019f84d76e62c11c44e30

risk of detention at CFIs)[6]; Priscila Alvarez, *Exclusive: New Trump administration plan could end asylum claims and speed deportations for hundreds of thousands of migrants,* CNN (June 25, 2025).[7]

By dismissing Plaintiff's application without satisfying these procedural prerequisites, USCIS acted contrary to both governing regulations and its own binding procedural manual, rendering the dismissal arbitrary, capricious, and unlawful under the APA. *See* C.F.R. § 235.3(b)(1)(ii), (2)(i).

### iii.    Defendants violated Plaintiff's due process rights.

The Fifth and Fourteenth Amendments of the U.S. Constitution prevent the Government from depriving people of "life, liberty, or property, without due process of law." U.S. Const. amend. V. That protection applies to immigrants like Plaintiff as much as it does to citizens. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). And courts have long held that a person's right to due process applies to the proceedings through which the Government seeks to remove them from the United States. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 306 (1993); *Khouzam v. Att'y Gen. of the U.S.*, 549 F.3d 235, 256–57 (3d Cir. 2008); *see also* 8 U.S.C. § 1158(a)(1). Besides that inherent interest, the Government can by law or its own actions create interests that then receive due process protection. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). That includes an immigrant's right to seek asylum. "[F]airness mandate[s] that the asylum procedure promulgated by the Attorney General provide the most basic of due process."

---

[6] Available at: https://www.npr.org/2025/08/10/nx-s1-5487598/asylum-seekers
[7] Available at: https://www.cnn.com/2025/06/25/politics/migrants-asylum-claims-deportations

*Calderon-Rosas v. Att'y Gen*, 957 F.3d 378, 384 (3d Cir. 2020) (quoting *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996)). At bottom, the due process protection of those interests includes "notice and a meaningful opportunity to be heard," *Jarbough v. Att'y Gen.,* 483 F.3d 184, 190 (3d Cir. 2007); *see also A.A.R.P. v. Trump*, 605 U.S. ___, ___ (2025) ("We have long held that no person shall be removed from the United States without opportunity, at some time, to be heard").

Here, Plaintiff will prevail on his due process claim for two reasons. One is that in the face of the Government seeking to remove him, the Government apparently intends to give him a "skimpy process" that is "faster moving—and much less procedurally robust" than the asylum procedures he is guaranteed by law. *Make the Rd. N.Y.*, 2025 WL 2494908, at *4-6 (holding that the expansion of expedited removal to people already in the United States likely violates due process). USCIS refuses to adjudicate his application, as required by law, and he has no access to immigration court where he could assert it defensively. *See* 8 U.S.C. §§ 1158(a)(1), 1229a; 8 C.F.R. §§ 208.2(a)-(b), 1003.14(a). The second is that Congress bound USCIS via 8 U.S.C. § 1158(a)(1) and 8 C.F.R. § 208.2(a) to a nondiscretionary duty to adjudicate pending asylum applications. It needn't have done that, but because it did, USCIS cannot simply dismiss asylum applications to facilitate expedited removal, because doing so deprives people like Plaintiff of notice and an opportunity to be heard. It certainly cannot purport to place him expedited removal proceedings, citing a phantom Form I-860 that Plaintiff never received or an expedited removal process that was never initiated, as a basis to divest itself of jurisdiction and summarily dismiss his asylum

application. As relevant here, that lack of notice offends the core due process requirement of a meaningful opportunity to be heard. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("This right to be heard has little reality or worth unless one is informed that the matter is pending"). And that lack of notice applies specifically to possible removal. *Trump v. J.G.G.*, 604 U.S. ____ (2025) (those detained and allegedly subject to the Alien Enemies Act "must receive notice. . . within a reasonable time and in such a matter as will allow them to actually seek . . . relief").

## B. Plaintiff will experience irreparable injury absent injunctive relief.

Plaintiff will suffer irreparable harm in several independent ways. First, he will suffer irreparable harm because of the effects the Government actions has had on his immigration legal situation. If his application is not reinstated, he will lose the ability to seek asylum through an application lawfully filed within the one-year deadline. In fact, because the Government has not issued him a Notice to Appear and simply states that it issued an (either phantom or unlawful) expedited removal order, he cannot even raise an asylum claim in those proceedings. And he faces the ongoing accrual of unlawful presence, which jeopardizes his ability to obtain other immigration relief. Second, because he has lost the status conferred by a pending asylum application, under the current practices of DHS and ICE, he faces the risk of arrest, immediate detention, transfer across the country away from his family and longstanding legal counsel, and expedited removal to either the country where he long faced political persecution or a separate third country where he may also face persecution. Third, he is suffering considerable harm to his day-to-day life because of

the Government's actions. And the prospect of detention and removal—including specifically to a country he has fled because of persecution—is causing him ongoing and considerable emotional distress. Any one of these harms would support preliminary injunctive relief to maintain the status quo.

> **i.    Plaintiff has lost statutory eligibility for asylum, and even if he could assert his claim, the standard and process in expedited removal is not comparable.**

USCIS's dismissal of Plaintiff's asylum application, despite having jurisdiction over it, has left Plaintiff with no avenue to apply for asylum because the government has also refused to initiate removal proceedings against him where he could assert his asylum claim defensively. 8 U.S.C. § 1229; 8 C.F.R. § 1003.14. Plaintiff took every possible step to comply with the law—he affirmatively filed for asylum within one year of his entry even when the Government refused to issue him a Notice of Appear at the repeated request of his counsel. Exs. 4; 5. That timely application protected Plaintiff's rights. However, he now has no asylum application pending anywhere, and has nowhere to file one because DHS refused to simply file an NTA and initiate removal proceedings. In any subsequent attempt to renew his application, DHS would likely, and improperly, invoke the one-year filing deadline as barring his application. 8 U.S.C. § 1158(a)(2)(B).

This evisceration of his right to meaningfully apply for asylum, Congress's most fundamental protection for individuals fleeing persecution, is itself an irreparable harm. *See Kenyeres v. Ashcroft*, 538 U.S. 1301, 1305 (2003) (describing how consideration of the likelihood of future harm, apart from the merits issue on the

asylum case, should be part of the irreparable harm inquiry); *Patel-Hasmukhbhai v. Barr*, No. CV-20-01121, 2020 WL 13544980, at *3 (D. Ariz. June 8, 2020) ("Because removal would deprive Petitioner of the relief she seeks—asylum in the United States—she has shown that it is probable that she would suffer irreparable harm absent a stay"). And to the extent that the Government would urge him to undergo a credible fear interview as part of the expedited removal process, as noted, that process does not include either a meaningful right to counsel or Article III judicial review— which renders it neither a suitable alternative to the process that Plaintiff had lawfully invoked, nor procedure that complies with due process in its own right. *See* Section II.A., *supra; Make the Rd. N.Y.*, 2025 WL 2494908, at *6 (holding that the expedited removal "procedures currently in place fall short" of due process when applied to people already inside the United States); *Khan v. Holder*, 608 F.3d 325, 329 (7th Cir. 2010) (describing the expedited removal process as "fraught with risk of arbitrary, mistaken, or discriminatory behavior").

Besides the right to apply for asylum, however, the Government has also imposed other legal harms on Plaintiff's ability to seek status and avoid persecution in Nicaragua. Because USCIS has dismissed his asylum application, Plaintiff has no status, and Plaintiff is accruing daily unlawful presence in the United States, jeopardizing his future immigration eligibility. *See* 8 U.S.C. § 1182(a)(9)(B)(i), (iii)(II).[8] Accrual of out-of-status time is particularly irreparable because lengthy re-

---

[8] Prior to the dismissal of his I-589, Plaintiff was in an authorized period of stay based on a pending bona fide application of asylum and was not accruing unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B).

entry bars are not subject to judicial review. *See* 8 U.S.C. § 1182(a)(9)(A), (C)(i)(II). This all matters because Plaintiff has specialized skills in the metal refining industry, Ex. 10, ¶24, that could support lawful status in another visa category even if his asylum application had been denied—or, if it is lawfully reinstated and later denied on the merits. But if Plaintiff has accrued more than a year of unlawful presence, he becomes inadmissible regardless of visa category. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(II).

Courts routinely grant injunctive relief to address the accrual of unlawful presence, given both its effects and difficulty to fix after the fact. *See Student 1 v. Noem*, 2025 WL 1431186 at *29 (D.N.J. May 19, 2025) (describing how the accrual of unlawful presence, along with other factors, constitutes harm that is not speculative nor hypothetical); *Garcia v. United States Customs & Border Prot.*, Civ. No. 21-5468, 2021 WL 4815945, at *4 (C.D. Cal. Aug. 20, 2021) (granting preliminary injunction to prevent accrual of out-of-status time, and rejecting arguments that "voluntary" departure would render the harm not irreparable); *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 387 (M.D.N.C. 2019) (finding that the plaintiffs were likely to suffer irreparable harm due to proposed new policy that could result in the plaintiffs being deemed out-of-status and therefore subject to a reentry bar); *Ruiz-Diaz v. United States*, Civ. No. 07-1881, 2008 WL 3928016, at *2 (W.D. Wash. Aug. 21, 2008) (stating that enjoining "the accrual of unlawful presence time" would "prevent irreparable harm to class members and their families").

Furthermore, the Government's actions in other cases show that it is extremely unlikely that they will return Plaintiff if he is erroneously deported – the Government

has already erroneously deported many people and refused to return them. *See D.A. v. Noem*, No. 25-cv-3135, __ F.Supp.3d. __, 2025 WL 2646888, at *5-8 (D.D.C. Sep. 15, 2025) (the Government stated it cannot return five men deported to Ghana, even though these men have protection from removal to their home countries and Ghana will deport these men to their home countries); *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501 (D. Md. 2025) (the Government deported Mr. Abrego Garcia to El Salvador despite a court order, and refused to return him); *A.A.R.P. v. Trump*, 605 U.S. ___, ___ (2025) (Supreme Court intervening in the middle of the night to order the government not to remove plaintiffs without giving them adequate opportunity to file habeas petitions); *Melgar-Salmeron v. Bondi*, No. 23-7792 (2d Cir. 2025) (involving, approximately thirty minutes after the Second Circuit granted Melgar-Salmeron a stay of removal, the government placing him on a plane and deporting him to El Salvador); *DHS v. D.V.D.*, 145 S. Ct. 2153 (2025) (deporting a gay Guatemalan man to Mexico despite his fear of being tortured there and without giving him an opportunity to contest this removal, and he was soon after deported to Guatemala by Mexico).

These sorts of harms fit squarely within the category discussed by the Third Circuit in its most recent case on preliminary injunctive relief. Last year, the Circuit rejected "generalized claim[s] of harm" as a basis for injunctive relief, but pointed out that injunctions should issue if, "without a preliminary injunction, the District Court will be unable to decide the case or give [him] meaningful relief." *Del. State Sportsmen's Ass'n*, 108 F.4th at 204. Plaintiff fits the bill—absent injunctive relief, he

will lose the ability to seek asylum on the same or in a comparable posture, will lose the ability to seek other forms of immigration relief, and, if he is arrested and removed from the country, *see* Section III.B.ii., *infra*, the Court would be unable to give him meaningful relief regardless of how correct he is on the merits, *see* Section III.A., *supra*. An injunction would "preserve the status quo during the pendency of litigation," *Del. State Sportsmen's Ass'n*, 108 F.4th at 201, and the status quo here is Plaintiff maintaining provisional status while USCIS adjudicates his pending asylum application. An injunction should issue.

      **ii.    Plaintiff currently has no status, and so faces the risk of detention and expedited removal at any moment.**

Because of the dismissal of his asylum application without adjudication and its other ongoing practices, the Government has ensured that Plaintiff faces arrest and detention by ICE at any moment. This is an enormous change for Plaintiff, who from April 21, 2022, to June 17, 2025, had authorized status in the United States as an applicant for asylum. *See* USCIS Policy Memorandum "Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act," (May 6, 2009), p. 29, section (b)(2)(B).[9] By removing that authorized status, Defendants have ensured that Plaintiff faces arrest at any point as a person without that status.

---

[9] Available at:
https://www.uscis.gov/sites/default/files/document/memos/revision_redesign_AFM.PDF

And that arrest, and resulting detention, is likely to happen. Evidence—including leaked information from Defendants—suggests that the Government is dismissing asylum applications like Plaintiff's specifically so that it can arrest those asylum seekers when they lose the protections afforded to asylum applicants. *See* Ximena Bustillo, *Asylum-seekers thought they were following the rules. Now some are told to start over,* NPR (August 10, 2025) (reporting on USCIS asylum application dismissals, and the risk of detention at CFIs)[10]; Priscila Alvarez, *Exclusive: New Trump administration plan could end asylum claims and speed deportations for hundreds of thousands of migrants,* CNN (June 25, 2025)[11] (describing the Trump administration's plan to dismiss the asylum claims of hundreds of thousands of migrants who entered the United States and applied for asylum, by subjecting them to expedited removal).

Plaintiff currently has no status. If the Government actually has unlawfully placed him in expedited removal proceedings, his next step is a credible fear interview—an interview at which he is all but certain to be detained, no matter the outcome. Exs. 11, ¶6-10 (asserting that, in Pennsylvania, many people are being detained at CFIs, regardless of the outcome, after USCIS dismissed their asylum application, including her client with no criminal record who passed his CFI); 14, *3 (describing "DHS now frequently detains asylum seekers post-dismissal [and] [i]n some cases, asylum seekers are detained after their CFI at an asylum office. . . .").

---

[10] Available at: https://www.npr.org/2025/08/10/nx-s1-5487598/asylum-seekers
[11] Available at: https://www.cnn.com/2025/06/25/politics/migrants-asylum-claims-deportations

But it need not happen at the CFI; Plaintiff is a prime target for arrest under the Government's current policies and practices. *See Aviles-Mena*, 2025 WL 2578215, at *4, 16 (Plaintiff was detained at an ICE check-in shortly after her asylum application was dismissed by USCIS and subjected to expedited removal. After the district court granted a TRO, the government stated that "absent the TRO, it remains free to subject Aviles-Mena to mandatory detention under section 1225(b)(1), a statutory scheme that is no longer inapplicable to him, and provide him with no further process to challenge his detention," which the court found was irreparable harm requiring a preliminary injunction); *Make the Rd. N.Y.*, 2025 WL 2494908 (recognizing the government's "aggressive use of its newly expanded expedited removal power" to "promptly arrest[] individuals inside of [immigration] courts, and then shuttled them into much faster moving—and much less procedurally robust—expedited removal proceedings," and staying the government's expansion of expedited removal as violating due process); *Coal. for Humane Immigrant Rights*, __ F.Supp.3d __, 2025 WL 2192986, at *5, *36 n.14 (recognizing that "hundreds of thousands of noncitizens" "now face the threat of removal under highly truncated procedures," and that "DHS sees and is using expedited removal as a basis to arrest and detain immigrants") Martha Bellisle, *Homeland security officials defend immigration court arrests after being sued*, AP News (July 17, 2025) (reporting DHS official as stating it conserves

law enforcement resources to arrest people at appointments "because they already know where a target will be").[12]

Even in the meantime, Plaintiff routinely drives to and from work and his children's schools, which puts him at risk of contact with ICE agents—or with law enforcement agents working with ICE through *e.g.* § 287(g) agreements, which include those from 25 state agencies and numerous surrounding county and local entities. *See* American Immigration Council, *The 287(g) Program: An Overview* (July 8. 2021)[13]; DHS, *ICE's 287(g) Program*[14]; ACLU, *License to Abuse: How ICE's 287(g) Program Empowers Racist Sheriffs* (April 26, 2022).[15]

Data obtained through the FOIA also demonstrates that Plaintiff will almost certainly be arrested following his next interaction with ICE. Ex. 12. The data shows that ICE apprehensions and detentions in Pennsylvania have soared since January of 2025. *Id.* ¶9 (graph showing 151 detentions in December 2024, compared to 723 in June 2025 in Pennsylvania). People born in Nicaragua who reside in Pennsylvania are also being arrested and detained by ICE at far higher rates. *Id.* ¶10. The number of individuals who are subject to expedited removal proceedings is also rising dramatically. *Id.* ¶12 (noting an increase of 119 individuals in January 2025 to 615 individuals in June 2025 placed in expedited removal). Apprehensions of

---

[12]    Available at: https://apnews.com/article/ice-immigration-court-immigrants-a5190ada4a6019f84d76e62c11c44e30

[13]    Available at: https://www.americanimmigrationcouncil.org/fact-sheet/287g-program-immigration/

[14] Available at: https://www.ice.gov/identify-and-arrest/287g

[15]    Available at: https://www.aclu.org/publications/license-abuse-how-ices-287g-program-empowers-racist-sheriffs

Pennsylvanians for expedited removal is even more extreme. *Id.* (showing an increase of two individuals in January 2025 to 206 individuals in June 2025 placed in expedited removal).

Plaintiff has no history of criminal contact, but that actually increases his risk of arrest rather than lowering it. Since January, the risk of arrest and detention for noncitizens with no criminal history—like Plaintiff—has risen dramatically. *See* Austin Kocher, *ICE Detention Numbers Decline Slightly, Only Immigrants with No Criminal Record Grow*, (July 18, 2025)[16]; Joe Yerardi, *ICE arrests in Pa. And N.J. are surging, including people without criminal records,* The Philadelphia Inquirer (July 22, 2025).[17]; *see also* Ex. 12 at ¶11. On January 12, 2025, 858 individuals were detained in ICE custody with no history of previous criminal charges or convictions; by July 13, 2025, that number had risen to 13,653. Austin Kocher, *ICE Detention Numbers Decline Slightly, Only Immigrants with No Criminal Record Grow*, (July 18, 2025).[18] This owes to the Government implementing high arrest quotas, demanding that federal agents arrest 3,000 people a day—or more than a million in a year—which the Government has chosen to accomplish by targeting people like Plaintiff who are complying with the law. *See Trump administration sets quota to arrest 3,000 people in a day in anti-immigration agenda*, The Guardian (May 29,

---

[16] Available at: https://austinkocher.substack.com/p/ice-detention-numbers-decline-slightly-e0d
[17] Available at: https://www.inquirer.com/news/pennsylvania/ice-raids-arrests-pennsylvania-delaware-nj-criminal-records-quota-20250722.html
[18] Available at: https://austinkocher.substack.com/p/ice-detention-numbers-decline-slightly-e0d

2025).[19] And in Pennsylvania, noncitizens with no criminal record face a higher risk even than in other states; here, noncriminal arrests made up an average of 51% of daily ICE arrests in early June, up 27% from early January. *See* Mike D'Onofrio et. al., *ICE arrests of noncriminals spike in Pennsylvania,* Axios Philadelphia (July 22, 2025).[20] Pennsylvania's average daily ICE arrests of those without criminal contacts is higher than the nationwide average of 47% in early June. *Id.; see also* Ex. 12, ¶11. There are numerous examples of ICE's direct targeting of noncitizens in Pennsylvania.[21]

---

[19] *Available at*: https://www.theguardian.com/us-news/2025/may/29/trump-ice-arrest-quota; *see also* ICE Detainees, TRACIMMIGRATION, *available at*: tracreports.org/immigration/detentionstats/pop_agen_table.html (last accessed Aug. 25, 2025) (showing that as of August 10, 2025, ICE detentions have nearly doubled year over year).

[20] *Available at*: https://www.axios.com/local/philadelphia/2025/07/22/ice-arrests-noncriminals-pennsylvania-immigration

[21] *See e.g.,* Ivey DeJesus, *Advocates decry ICE arrests of 26 construction workers on their way to work at a Pa. Hospital,* PennLive (Aug. 22, 2025) https://www.pennlive.com/news/2025/08/advocates-decry-ice-arrests-of-26-construction-workers-on-their-way-to-work-at-a-pa-hospital.html (describing one of the largest immigration roundups in central Pennsylvania under this administration where ICE agents arrested 26 construction workers on their way to a job site at a State College hospital in Centre County); Caroline Goggin, *14 arrested during ICE raid in West Norriton, Pa.*, 6ABC Action News (July 16, 2025) https://6abc.com/post/14-arrested-during-ice-raid-west-norriton-montgomery-county/17153388/ (describing how ICE arrested 14 people at a supermarket in West Norriton on July 16, 2025), ICE, *ICE and federal partners arrest 17 illegal aliens during worksite inspection in Bethlehem, Pa.*, (June 20, 2025) https://www.ice.gov/news/releases/ice-and-federal-partners-arrest-17-illegal-aliens-during-worksite-inspection (describing how ICE arrested 17 individuals working at an apartment complex on June 20, 2025); ICE, *ICE Philadelphia arrests 7 in worksite enforcement operation* (Jan. 31, 2025) https://www.ice.gov/news/releases/ice-philadelphia-arrests-7-worksite-enforcement-operation (describing how ICE arrested seven employees at a carwash in Philadelphia on January 28, 2025; ICE, *ICE Philadelphia arrests 24 immigration violators, including suspected MS-13 gang member and felon convicted of assault,*

And if Plaintiff is arrested, he will be detained without any release on bond. The Government takes the position that noncitizens who are present without admission—like Plaintiff—are "applicant[s] for admission" under 8 U.S.C. § 1225(b) and, therefore, subject to mandatory detention pursuant to § 1252(b). *See, e.g.*, *Leal-Hernandez v. Noem*, 1:25-cv-02428, 2025 WL 2430025, at *19 (D.Md. Aug. 24, 2025) (describing how DHS's new interpretation of § 1225 to subject more people to mandatory detention "deviates from decades of prior practice, established caselaw, and the plaintext of the INA"); Ex. 13 (DiFerdinando Aff.), ¶6-10, 14. Indeed, the BIA recently issued a precedential decision setting out its position that individuals in Plaintiff's position are subject to mandatory detention. *Matter of Hurtado,* 29 I&N Dec. 216 (BIA 2025). Even if it had not, Plaintiff would still face detention: when immigration judges *do* grant bond pursuant to a court order, ICE immediately invokes a 24-hour automatic stay, barring noncitizens from posting the bail that an immigration judge granted, which subjects most noncitizens to mandatory detention regardless of whether they pose danger or flight risk. Ex. 13, ¶11-13. So, Plaintiff will likely be subject to mandatory detention for the duration of his removal proceedings if detained by ICE. *Id*. ¶16. That detention, because it "cannot be remedied after the fact," is quintessential irreparable harm. *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 189 (D.D.C. 2015) ("Unlike economic harm, the harm from detention pursuant to an unlawful policy cannot be remediated after the fact").

---

(Aug. 25, 2025) https://www.ice.gov/news/releases/ice-philadelphia-arrests-24-immigration-violators-including-suspected-ms-13-gang (describing how ICE officers arrested 24 individuals for immigration law violations in Bellefonte, Pennsylvania).

And when he is detained, Plaintiff faces even other potential irreparable harms. Some individuals detained in Pennsylvania are held at Moshannon Valley Processing Center in Philipsburg, PA—a facility known for mistreatment, including solitary confinement, physical harm by staff members, racial and ethnic discrimination, psychological abuse, and religious intolerance, and sexual assault by staff, among other well-documented inhumane conditions, *In the Shadow of the Valley: The Unnecessary Confinement and Dehumanizing Conditions of People in Immigration Detention at Moshannon Valley Processing Center*, Stephen and Sandra Sheller Center for Social Justice (2024),[22] and recently saw an inmate suicide, Jeff Gammage, *ICE detainee found hanging in Moshannon shower room, was awaiting immigration hearing, officials say*, Philadelphia Inquirer (Aug. 7, 2025).[23] If he were not detained there, it would owe to ICE having recently increased the rate at which it ships noncitizens detained in the Northeast to facilities in rural Louisiana and Texas, and elsewhere across the South. *See* Eric Levenson & Gloria Pazmino, *Why ICE is really moving detainees over a thousand miles from where they were arrested*, CNN (April 10, 2025).[24]; Ex. 11, ¶10 (recounting that a Pennsylvania client had their USCIS I-589 dismissed, passed a CFI, and was immediately detained and sent to Louisiana). Shipping him thousands of miles would, among other harms, cut off his

---

[22] Available at: https://acrobat.adobe.com/link/review?uri=urn:aaid:scds:US:a0551b5d-811e-3597-90cf-c77436a5eb93

[23] Available at: https://www.inquirer.com/news/ice-detention-suicide-immigration-moshannon-20250807.html

[24] Available at: https://edition.cnn.com/2025/04/10/us/immigration-detainees-trump-ice-students-visa/index.html

access to his now-longstanding immigration counsel. And detention at either Moshannon or (especially) elsewhere would impose considerable harms on Plaintiff by making it prohibitively expensive and logistically impossible for his family to visit him and maintain contacts.

Through that lack of access to counsel and the differences in legal status discussed in III.A., *supra*, the Government seeks to remove him, and will do so as quickly as it can. Removal is itself an irreparable harm warranting injunctive relief. *Costello v. INS*, 376 U.S. 120, 128 (1964); *see also B.C. v. Att'y Gen.*, 12 F.4th 315 (3d Cir. 2021) ("[Deportation] visits great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. . ."); *E.O.H.C. v. Sec'y DHS*, 950 F.3d 177, 187 (3d Cir. 2020) (holding that "the constitutional harm from [removing clients to Mexico during the pendency of their immigration proceedings] could not be remedied after a final order of removal"). But the irreparable harm of removal applies even more strongly when removal would entail return to a country from which someone (with an unadjudicated asylum claim) has fled persecution. *See Carmona-Gonzalez v. Garland*, No. 23-3317, 2023 WL 8372999 (6th Cir. 2023) ("It goes without saying that persecution and torture are irreparable harm. . ."); *see also De Jesus Martinez v. Nielsen*, 341 F.Supp.3d 400, 408 (D.N.J. 2018) (finding irreparable harm from deportation if petitioner were deported while asylum application pending) (citing *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010)). And this applies particularly when a noncitizen's removal would result in separation from spouse and children—as would Plaintiff's potential removal, because his spouse and

children live in Philadelphia (where they have their own pending immigration proceedings and defensive requests for asylum pending). *See Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc) ("Other important [irreparable harm] factors include separation from family members, medical needs, and potential economic hardship").

But recent changes to Government practices have amplified the possible harm from removal, too. Plaintiff faces imminent risk of removal not only to a country in which he faces persecution, but to third countries as to which he has no tie and that the Government has selected despite—or because of—those countries' willingness to detain, torture, or kill the noncitizens the United States sends them. *See* Nick Turse, *Trump's Gulag Search Expands to 53 Nations*, The Intercept (Jun. 25, 2025).[25] Many of these countries are racked with conflict, terrorist violence, or have even been excoriated by our own State Department for human rights abuses. *Id.*; *see also* Sergio Martinez-Beltran & Manuel Rueda, *'Hell on Earth': Venezuelans deported to El Salvador mega-prison tell of brutal abuse*, NPR (July 27, 2025)[26] (describing how individuals deported to the Salvadoran prison CECOT were tortured by guards when they were beaten with batons, sexually assaulted, and denied access to counsel).

---

[25] *Available at*: https://theintercept.com/2025/06/25/trump-immigrant-deportations-supreme-court/. *See also* Josh Gerstein & Kyle Cheney, *Kilmar Abrego Garcia fights imminent deportation to Uganda,* Politico (Aug. 25, 2025), *available at*: https://www.politico.com/news/2025/08/25/kilmar-abrego-garcia-fights-imminent-deportation-to-uganda-00522978 (discussing exporting noncitizens to third countries).
[26] *Available at*: https://www.npr.org/2025/07/27/nx-s1-5479143/hell-on-earth-venezuelans-deported-to-el-salvador-mega-prison-tell-of-brutal-abuse.

These countries are also deporting these people back to their home countries from which they fled—actions which "appear to be part of a pattern and widespread effort to evade the government's legal obligations by doing indirectly what it cannot do directly." *D.A.*, __ F.Supp.3d. __, 2025 WL 2646888, *5 (describing how five men were deported to Ghana and then deported by Ghana to their home countries even though these men have protection from removal to their home countries, and collecting numerous other similar cases).

### iii. Plaintiff is suffering emotional distress and has had to change his day-to-day life as a result of Defendants' unlawful actions.

Plaintiff has a separate basis for injunctive relief in the manner that Defendants' actions have forced him to change his day-to-day life and imposed considerable fear and emotional distress on him. Ex. 10, ¶24-33. Fear of unlawful arrest, detention, and removal amounts to irreparable harm. *Melendres v. Arpaio*, 695 F.3d 900, 1002 (9th Cir. 2012) (recognizing that the fear of being subject to unlawful detention may itself constitute irreparable harm). But more generally, Plaintiff is suffering considerable distress on a day-to-day basis. For one thing, as noted above, he has no status that protects him in public—and Plaintiff has become fearful on a daily basis and avoids leaving his house other than to go to work and take his children to school. Ex. 10, ¶30. And those unavoidable trips risk arrest and detention, and have caused him considerable fear and have pushed him to take time off work so that he does not have to leave his home. *Id*. at ¶27, 31.

The threat of deportation has exacerbated his symptoms of psychological distress, including such a profound fear that he is afraid to leave his home, took time off work, is so depressed and anxious that he is seeking therapy for the first time in his life, and stopped looking to purchase a home in Philadelphia because of the increased threat of deportation since his asylum application was unlawfully dismissed. *Id.* at ¶24-33. The unjust threat of deportation and associated mental distress constitute irreparable harm. *See e.g., Doe #1 v. Noem*, No. 25-cv-317, 2025 WL 1555382, at *10 (W.D. Wis. June 2, 2025) (holding that "the mental anguish and fear from the mere threat of arrest, detention, and deportation is a further irreparable harm that is not speculative").

### C. The Defendants will suffer no harm from a grant of preliminary relief.

The balance of equities overwhelmingly favors Plaintiff here. Without injunctive relief, he faces the loss of his ability to pursue asylum, violation of his statutory and constitutional rights, and unlawful detention. *See Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (noting substantial private interest in remaining out of custody). On the other side, the Government suffers no harm at all when required to comply with its legal obligations. *See Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992) ("[T]he public interest is served when administrative agencies comply with their legal obligations."); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011) (observing lack of government interest in "deliver[ing] aliens into the hands of their persecutors"). And it particularly has no interest in violating people's rights. *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)

("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution"); *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983) ("The government is not 'harmed in any legally cognizable sense by being enjoined from constitutional violations'"). Nor does it have an interest in acting pursuant to unlawful agency decisions that violate the APA. *E.g. League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

### D. An injunction will serve the public interest.

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). This is especially so when, as here, constitutional rights are at issue—because "the public interest clearly favors the protection of constitutional rights." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002). Where, as here, the Government now seeks to remove Plaintiff based on a phantom Form I-860 that it never served on him or as to which it followed any other requirements required by 8 U.S.C. § 1225(b)(1)(A)(i) and 8 C.F.R. § 235.3(b)(2), and where he consequently has had no notice or opportunity for meaningful hearing, not only is that expedited removal order void, it implicates constitutional due process rights that tip the public interest factor in Plaintiff's favor.

## IV.    Conclusion

In light of the foregoing, Plaintiff respectfully requests that this Court:

1) Order USCIS to reinstate Plaintiff's timely-filed I-589 affirmative application for asylum;

2) Order Defendants to refrain from arresting, detaining, or removing Plaintiff pending the resolution of this case.

Such action would maintain the status quo pending the outcome of the case.

Respectfully submitted,

/s/ Jim Davy
Jim Davy (PA ID 321631)
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
215-792-3579
jimdavy@allriselaw.org

Jonah Eaton (PA ID 311559)
Michael Geoffino (PA ID 333816)
Lilah Thompson (PA ID 324718)
Mikaela Wolf-Sorokin (PA ID 335725)
Nationalities Service Center
1216 Arch Street, 4th Floor
Philadelphia, PA 19107
215-893-8400
jeaton@nscphila.org
mgeoffino@nscphila.org
lthompson@nscphila.org
mwolfsorokin@nscphila.org

*Pro Bono* Attorneys for Petitioner

## CERTIFICATE OF SERVICE

I certify that on October 2, 2025, this memorandum was filed using the Court's

CM/ECF system. All party counsel are e-filers and will receive a copy via ECF.


<u>/s/ Jim Davy</u>

Jim Davy